IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
TRENTON GARTMAN,              )
                              )
        Plaintiff,            )
                              )        CIVIL ACTION NO.
        v.                    )         2:18cv534-MHT
                              )            (WO)
PATRICK CHEATHAM, an          )
Individual, et al.,           )
                              )
        Defendants.           )
```

OPINION AND ORDER

Pursuant to 42 U.S.C. § 1983, plaintiff Trenton Gartman brings this lawsuit seeking damages from, among others, defendants Jabari Agee and Patrick Cheatham for violation of his Fourteenth Amendment right to medical care while he was in pretrial custody at the Autauga County Jail. Agee and Cheatham were employed as officers in the jail and are sued in their individual capacities. Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

Agee and Cheatham have moved to dismiss the federal claim against them on the basis of failure to state a

claim and qualified immunity.   For the reasons that follow, the motion will be denied.


## I.   MOTION-TO-DISMISS STANDARD

In considering a defendant's motion to dismiss, the court accepts the plaintiff's allegations as true, *see Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), and construes the complaint in the plaintiff's favor, *see Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir. 1993). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007), "only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).


## II.   FACTS

The allegations in the third amended complaint are as follows.

On May 25, 2016, plaintiff Gartman was arrested by the Prattville, Alabama Police Department on a misdemeanor charge for domestic abuse in the third degree.  He was taken to the Autauga County Jail, booked, and processed as a new inmate.

Gartman suffers from a heart condition that requires regular medication, and he has an implantable cardioverter defibrillator (ICD), a battery-operated device that was surgically implanted in his chest to control his heart rate.  During processing, he informed

3

defendant Officer Cheatham of his condition and his need to take his heart medications.  However, when his parents brought his heart medications to the jail, they were informed by jail personnel that Gartman could not have them unless his doctor verified them.  His parents were not allowed to leave his medications with jail personnel.

After he was processed, Gartman was placed in the 'drunk tank' along with several other inmates.  Sometime between 11:00 p.m. and 12:00 a.m. that night, Gartman began to sweat and to experience shortness of breath and problems with his heart.  He communicated these symptoms and his history of heart problems to an officer at the jail who is not a defendant in the lawsuit, who called the on-call nurse and reported Gartman's symptoms.  The nurse told the officer to do nothing further regarding Gartman and said that she would check on Gartman once she arrived at the jail in the morning.  However, after she arrived at work, the nurse failed to make any attempt to check in on Gartman.

Due to excessive heat in the drunk tank, Gartman and the other inmates were moved to another cell at around 3:00 or 4:00 a.m.  While he was being moved, Gartman repeatedly informed jail officers that he was experiencing chest pains, shortness of breath, and dizziness.  He also reported that the symptoms were getting worse.  In the hours after he was moved, Gartman repeatedly pushed the call button in his cell and told the jail officers that his symptoms were continuing and his condition was deteriorating.  At around 12:00 p.m., another inmate noticed Gartman's poor condition and advised jail officers that Gartman was obviously dealing with a serious medical issue and needed to see a nurse.

Between 2:00 and 3:00 p.m., more than 14 hours after Gartman began experiencing symptoms, defendant Officer Agee took Gartman to the jail medical unit.  There, Gartman was seen for the first time by a nurse.  With Agee present, Gartman described his health history and symptoms to the nurse.  He explained that he had a heart condition and an ICD, that he had not been able to take

5

his needed heart medications, and that he was
experiencing ongoing chest pain and shortness of breath.
He also told the nurse that the symptoms were getting
worse and that he needed medical care.

The nurse ordered Gartman to provide a urine sample.
Officer Agee escorted Gartman into the bathroom and
waited for him by the sinks.  As Gartman stood in front
of the toilet, however, his ICD fired, sending an
electric shock into his heart and causing him to fall to
the floor.  Agee witnessed both this fall and Gartman's
cries of pain.  When Agee told Gartman to get up, Gartman
explained that he could not get up because his ICD had
just fired.  Agee helped Gartman stand and return to the
medical unit.

Once back in the medical unit, Gartman told the nurse
that his ICD had fired while he was in the bathroom,
causing him to fall and making it impossible for him to
provide a urine sample.  The nurse checked his heart rate
and reassured him that he was fine.  She told him that
she was going to send him back to his cell so she could

6

go do pill call.  Gartman insisted that he was not fine, that his ICD had fired, and that he needed urgent medical help.  The nurse told Gartman that she did not have time to run any tests on him and, since he was due to be released later that evening, he could get his medications and any necessary medical help after he was released. Once again, Agee was present and listened to the entire exchange.

The nurse told Agee to move Gartman from his previous cell back to the drunk tank, which was next to the booking area.  She explained that this move would make it easier for jail officers to keep an eye on Gartman until his release.

Officer Agee escorted Gartman out of the medical unit.  They encountered Officer Cheatham in the hallway, and Agee updated him about Gartman's condition.  The two officers decided that before they could take Gartman to the drunk tank, they needed to escort him back to his previous cell so he could collect his bedding.

7

Gartman collected his bedding without incident and turned to walk with Agee and Cheatham to the drunk tank. At that point, however, his ICD fired once again, causing him to cry out in pain and fall to the floor.  The shock from the ICD also caused Gartman to lose control of his bowels, and he defecated on himself as he lay on the floor.

Agee and Cheatham saw Gartman fall to the floor and told him to get up.  Even after Gartman explained to them that his ICD had fired again and that he was weakened and in pain from the shock, the officers repeatedly ordered him to stand.  Eventually, Gartman was able to stand up and begin walking again.  After only a few more steps, however, his ICD fired again, and he once again fell to the floor.  At this point, Agee and Cheatham began yelling at and mocking Gartman.  Another jail officer drew his taser, pointed it at Gartman, and threatened to use it on him if he did not stand up and walk.

Under the threat of being tased, and while still being yelled at and mocked by Agee and Cheatham, Gartman

8

struggled back to his feet and began to walk slowly toward the drunk tank.   Gartman was sweating profusely and was short of breath.   He told Agee and Cheatham again that he was experiencing significant chest pain and needed medical help.   Gartman's ICD shocked him a total of 17 times during the ten-minute walk to the drunk tank, causing him several more falls.   The shocks led Gartman to lose control of his extremities and flail noticeably, and during at least one fall he accidentally touched Cheatham.   Cheatham told Gartman that if he touched Cheatham again, he would charge Gartman with assaulting an officer.

After falling numerous times, Gartman finally reached the drunk tank.   At this point, he was on all fours and exhausted by the shocks.   Once in the cell, Gartman again tried to alert Agee and Cheatham to the fact that he was suffering chest pains, was being repeatedly shocked by his ICD, and believed he was having a heart attack.   Agee and Cheatham merely left Gartman in the cell.   They failed to notify their superiors or a medical

professional that Gartman's condition had gotten worse, that his ICD had fired numerous times, that he had defecated on himself, or that he could barely make it through the walk to the drunk tank.

At approximately 4:00 p.m., Gartman was visited by his attorney. The attorney immediately observed that Gartman appeared to be in significant physical distress and in need of urgent medical attention. During the attorney's visit, Gartman's ICD shocked him yet again. The attorney expressed concern to a jail officer about Gartman's obvious distress, and Gartman explained his symptoms and underlying conditions to the officer. However, Gartman received no additional care beyond being taken by wheelchair to the showers to clean himself off after having soiled himself. His ICD fired several more times while he was in the shower.

Gartman was eventually released at approximately 5:12 p.m., and someone from the jail called Prattville Fire/EMS to arrange for Gartman to be taken to the hospital for his symptoms. After Gartman had already

been placed in the back of the ambulance, Cheatham demanded that he sign a document entitled "Release and Hold Harmless Agreement" before he could leave.

Gartman was transported from the jail directly to a hospital, where he was admitted and treated for arrhythmia and acute heart failure. Gartman remained hospitalized for approximately three days and required heart catheterization procedures to treat his condition. After his release from the hospital, Gartman's cardiologist generated a report on data downloaded from Gartman's ICD. The data showed that the ICD had fired 37 times between 2:11 p.m. and 5:25 p.m. on May 26, 2016, while he was in custody at the Autauga County Jail.

## III.  DISCUSSION

### A. Fourteenth Amendment

Officers Agee and Cheatham move to dismiss Gartman's Fourteenth Amendment claim against them, arguing that he has failed to state a claim upon which relief can be

11

granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]

The Eighth Amendment prohibits "cruel and unusual punishments," U.S. Const. amend. VIII, including deliberate indifference to the medical needs of inmates. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  While claims involving the mistreatment of pretrial detainees in custody are governed by the Due Process Clause of the Fourteenth Amendment rather than by the Eighth Amendment, the Eleventh Circuit Court of Appeals treats the standard for deliberate indifference under the two amendments as "identical."  *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).

To plead a claim for deliberate indifference to his medical needs, a plaintiff must sufficiently allege "(1) a serious medical need; (2) the defendants'

---

1. The motion to dismiss also cites to Rule 12(b)(1), lack of subject-matter jurisdiction.  However, neither the motion nor the defendants' brief offers any argument or evidence in support of this ground, and the court finds that it does have subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).  The first prong is objective, focusing on the inmate's actual medical condition.  The second prong is subjective, focusing on the official's state of mind.

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). Alternatively, whether a medical need is serious can be determined by "whether a delay in treating the need worsens the condition." *Mann*, 588 F.3d at 1307.  Under either definition, "the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Id*.

Deliberate indifference requires that the official know of and disregard "an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

13

Deliberate indifference is more than negligence; it requires knowledge of the risk and disregard of the inference that such a risk could harm an inmate or prisoner. *See Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). An official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. While an official's failure to address a risk that he "should have perceived but did not" is "no cause for commendation," it does not rise to the level of deliberate indifference. *Id.* at 838.

A finding of deliberate indifference does not require that an inmate have been denied medical care entirely. Even if "medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). However, whether officials "should have employed additional diagnostic techniques or

**14**

forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (internal quotation marks and citation omitted).

## 1. Serious Medical Need

Because Gartman contends that Officers Agee and Cheatham were deliberately indifferent to his deteriorating medical condition after he was released from the jail medical unit, the court will confine its consideration of the seriousness of his medical needs to that period.[2]  Even within that narrow time frame, however, the gravity of Gartman's condition was obvious.

---

2. In his brief in opposition to the motion to dismiss, Gartman raises as an additional ground for Cheatham's deliberate indifference his failure to advise Gartman adequately on what he needed to do to receive his heart medication while in the jail.  However, Gartman does not plead any facts that would indicate that Cheatham knew or had any reason to know that a delay of less than a day in receiving his medication would cause Gartman to suffer adverse consequences.  Nor does he plead any facts that would indicate that Cheatham acted with anything more than mere negligence in failing to

15

Agee and Cheatham dismiss symptoms like shortness of breath, chest pain, and dizziness as insufficient to establish a serious medical need.  However, those are far from the only symptoms Gartman alleges.  In his complaint, he says that he became sweaty, clutched his chest, and cried out in pain as he was repeatedly and visibly shocked by his ICD.  These shocks caused him to lose control of his bowels and defecate on himself. Gartman's condition also interfered with his ability to walk, causing him to flail his extremities and fall to the floor numerous times.  He was so weakened by the end of the journey to the drunk tank that he crawled into the cell on his hands and knees and later required a wheelchair to reach the showers.  Even a layperson would

---

explain fully the jail's medication policy.  Therefore, the court finds that Gartman has failed to state a claim for deliberate indifference by Cheatham as to his actions during the intake process and need not consider whether his condition at that point was sufficiently serious. *See, e.g.*, *Morrison v. Stephenson*, No. 2:06cv283, 2008 WL 114890 (S.D. Ohio Jan. 9, 2008) (Frost, J.) (finding no deliberate indifference where, among other things, jail officials refused to provide plaintiff with her medication because it was not in a prescription bottle).

certainly recognize that Gartman's multitude of serious symptoms warranted medical attention. *See, e.g., Aldridge v. Montgomery*, 753 F.2d 970, 972 (11th Cir. 1985) (finding that a layperson could recognize a serious medical need where a detainee had a one-and-a-half-inch cut over his eye that was allowed to bleed for two and a half hours before it was sutured).

Indeed, a layperson allegedly *did* recognize the seriousness of Gartman's condition. The complaint alleges that it was immediately obvious to Gartman's attorney that his client was severely ill and required urgent medical attention. The attorney found Gartman's condition so alarming that he raised his concerns with a jail officer. The fact that Gartman's attorney allegedly "easily recognize[d] the necessity for a doctor's attention" and requested that Gartman receive such attention highlights just how clearly serious his condition was. *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003); *see also Patel v. Lanier Cty.*, 969 F.3d 1173, 1189 (11th Cir. 2020) (emphasizing the relevance of a

"layperson and eyewitness['s]" testimony that the inmate's physical distress was clear to a finding of serious medical need).[3]

The seriousness of Gartman's condition is made all the more obvious by the fact that he had a history of heart issues and an ICD in his chest, which he allegedly reported to Cheatham during intake and repeatedly mentioned throughout his incarceration. His condition was not limited to minor dizziness and shortness of breath, as the defendants characterize it: according to the complaint, he also complained of acute chest pain, turned pale, and became sweaty. In short, as Gartman told Agee and Cheatham directly multiple times, he was experiencing the symptoms of a heart attack. Any reasonable layperson would be aware that such symptoms

_____

3. At least one other layperson recognized the seriousness of Gartman's illness while he was in the jail. At around noon on May 26, before Gartman was taken to the medical unit, an inmate in a nearby cell observed that Gartman was in poor condition and alerted jail officers to Gartman's need to see a nurse. While this occurred outside the relevant timeframe, it is worth noting that even *before* Gartman's dramatic deterioration,

18

require immediate medical attention--and that the need for medical attention is even more urgent when the individual reporting such symptoms had a known heart condition.   Indeed, the fact that an inmate suffers from a known underlying condition related to his symptoms further heightens the seriousness and urgency of those symptoms.  *See, e.g., Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995) (finding that sweating, wheezing, and shortness of breath constituted a serious medical need in a patient with diagnosed asthma); *Aldridge*, 753 F.2d at 973 (finding that complaints of headaches and dizziness, coupled with a history of head injuries, could be a serious medical need); *see also Gordon v. Frank*, 454 F.3d 858, 863 (8th Cir. 2006) ("[A] reasonable officer would consider chest pain and difficulty breathing to be symptoms that require medical attention in anyone who claims to have heart disease."); *Wright v. Hernandez*, No. 2:10cv336, 2013 WL 4928439, at *5 (M.D. Fla. Sept. 12, 2013) (Steele, J.) (finding that a reasonable trier of

---

a layperson was able to recognize the seriousness of his

fact could find that "numerous complaints of dizziness, shortness of breath, chest pains, and falling," in conjunction with "plaintiff's known cardiac condition," constituted a serious medical need).

## 2. Deliberate Indifference

Officers Agee and Cheatham argue that their actions do not constitute deliberate indifference because they were simply relying on the professional medical judgment of the nurses, neither of whom indicated that Gartman's condition was serious or required immediate treatment. Gartman responds that Agee and Cheatham were on notice that they should be monitoring his condition because the nurse who examined him recommended that he be placed in the drunk tank so that the officers could keep an eye on him.

Gartman alleges sufficient facts to indicate that the officers were told directly that they needed to monitor his condition to ensure that his symptoms did not worsen.

---

condition and his need for medical treatment.

Even if this were not the case, however, it is clear that his alleged deterioration was so conspicuous that Agee and Cheatham could not have missed it and had a responsibility to respond to it.

It is true that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989). However, it "misstates the controlling law" to say that the "provision of medical care ... precludes an Eighth Amendment claim." *McElligott v. Foley*, 182 F.3d 1248, 1259 (11th Cir. 1999). An assessment by a medical professional does not relieve jail officials from their obligation to monitor inmates and provide care when needed. The Eleventh Circuit has made clear that "[t]he fact that [an inmate] had been seen by [a medical professional] does not mean that a layman could not tell that [the inmate] had a serious medical need" at a later time. *Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007). If an officer realizes that an inmate is still in need of care, even if he had previously been

seen by a medical professional, he has a duty to, at the very least, "look into the matter." *Id.* at 1328; *see also Fikes v. Abernathy*, 793 F. App'x 913, 924 (11th Cir. 2019) (finding that "when an inmate's medical condition is so obviously dire that a nonmedical official must know that the inmate requires additional medical attention," that official is deliberately indifferent if he chooses instead to do nothing (emphasis omitted)).[4]

The defendants err in characterizing Gartman's claim as a dispute over the adequacy of the treatment he received. In fact, Gartman's allegations against Agee and Cheatham are based on the deterioration in his condition that occurred *after* he was released from the medical unit. As his brief in opposition to the motion to dismiss points out, Gartman's condition allegedly deteriorated rapidly and dramatically after he was seen by the nurse, in ways that were visible and obvious.

_____

4. While unpublished opinions are not controlling authority, they may be cited as persuasive authority to the extent that their legal analysis warrants. *See Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007).

Agee and Cheatham were allegedly present as Gartman fell over and over again, defecated on himself, and complained of chest pain and shortness of breath.  The fact that they allegedly yelled at him to get up and mocked him for his symptoms indicates that they saw his struggles and were aware of his worsening condition.[5]  Gartman's serious medical need was obvious, particularly in light of his underlying heart condition, and Agee and Cheatham allegedly simply chose to ignore it.

The allegation that, upon noting Gartman's deterioration, neither Agee nor Cheatham offered him any assistance, provided him with additional medical care, or even reported his condition to the nurse or their supervisors is enough to state a claim of deliberate indifference.  *See McElligot*, 182 F.3d at 1259 (there was enough to find deliberate indifference where "the defendant was aware that plaintiff's condition was, in fact, deteriorating and still did nothing to treat this

_____

5. Indeed, Agee and Cheatham's allegedly aggressive and callous behavior could be viewed as evidence of their

deteriorating state"); *Carswell v. Bay Cty.*, 854 F.2d
454, 457 (11th Cir. 1988) (a jail administrator who saw
an inmate's deteriorating condition and was asked to get
the inmate to a doctor could have been found deliberately
indifferent for doing nothing to ensure that the inmate
received medical attention).  Instead, Agee and Cheatham
allegedly chose to mock Gartman for his illness.  Indeed,
the allegation that Cheatham demanded that Gartman sign a
release before he was allowed to go to the hospital
supports the conclusion that Cheatham was aware he had
violated Gartman's rights and was trying to protect
himself, his colleagues, and his employer from liability.

Agee and Cheatham are incorrect that Gartman's
condition was not severe or evident enough to warrant
their intervention.  Gartman's symptoms, as alleged in
the complaint, were dramatic and easily noticeable.  Any
reasonable observer would be able to recognize that an
inmate with preexisting heart problems who cried out
because of severe chest pain and trouble breathing; could

active intent to harm Gartman or as taking pleasure in

not walk without being shocked, flailing, and falling; and defecated on himself required immediate medical attention.

Though Agee and Cheatham allegedly *flatly ignored* Gartman's deterioration, offering him no additional care after he left the medical unit, they argue that their actions could constitute merely a few hours' delay in treatment since Gartman went to the hospital as soon as he was released. However, Agee and Cheatham err in concluding that a medical emergency, and the delay in treating it, must last for days or even months in order to be obvious and serious. It is well-established in the Eleventh Circuit that "an unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990). This is particularly true in the context of "emergency needs"--broken bones, bleeding cuts, and, much more seriously, heart attacks. *Farrow v. West*, 320 F.3d 1235, 1247 (11th Cir. 2003).

---

his suffering.

Whenever "the medical need involves life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem," even a delay of a few hours is enough to constitute deliberate indifference. *Id.* at 1245 (internal quotation marks, brackets, and citation omitted).

A heart attack is self-evidently the type of grave and urgent condition that requires immediate treatment. *See, e.g.*, *Williams v. Limestone Cty.*, 198 F. App'x 893, 896 (11th Cir. 2006). Other federal courts of appeals have held that a delay of mere minutes in treating a heart attack victim may constitute deliberate indifference. *See Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) (finding a delay of ten minutes enough to constitute deliberate indifference); *Bass ex rel. Lewis v. Wallenstein*, 769 F.2d 1173, 1183 (7th Cir. 1985) (a delay of ten to 15 minutes could constitute deliberate indifference). And, based on the facts alleged in the complaint, there was no reason for this delay--the officers could have gotten medical assistance for Gartman

26

immediately, but chose to mock and then ignore him instead. The allegation that Agee and Cheatham failed to provide Gartman with any care in the two to three hours after his release from the medical unit, as his condition deteriorated significantly in front of them, is enough to state a claim of deliberate indifference.

Agee and Cheatham further argue that Gartman fails to plead that each of them individually had subjective knowledge of his serious medical need. However, at the motion-to-dismiss stage, all that is required is that Gartman allege "sufficient facts ... to make it plausible that the defendants had knowledge of the substantial risk of serious harm he faced," not that he include allegations about each defendant's mental state. *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016). An allegation that a plaintiff informed a defendant of the substantial risk of harm the plaintiff faced is enough to satisfy this standard. *See id.* at 1309. And "the very fact that the risk was obvious" is also enough to

27

establish that a jail official knew of it.  *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

Based on the facts alleged in the complaint, there is no way that either Agee or Cheatham could have been unaware of the fact that Gartman was gravely ill, in serious pain, and in need of immediate medical treatment. Both officers were allegedly fully aware of his heart condition and ICD: Gartman explained his medical history to Cheatham during intake, and Agee was present when Gartman recounted the same history to the nurse.  On the walk to the drunk tank, Gartman reiterated the fact that he had an ICD and told both officers directly that he believed he was having a heart attack and needed immediate medical help.  He repeated his pleas once again when they reached the cell.  The fact that Gartman allegedly communicated the danger of his condition to the officers is enough to establish that they did, in fact, know of the risk.

Moreover, both officers were allegedly present for Gartman's alarming and unmistakable deterioration on the

walk to the drunk tank, during which he repeatedly fell, defecated on himself, clutched his chest, and grew weak and sweaty.  Gartman need not plead what the officers were actually thinking in order to establish that his condition was so obvious and severe that they knew about it and the risk it posed to his health and ignored it anyway.  *Harper v. Lawrence Cty.*, 592 F.3d 1227, 1234 (11th Cir. 2010) (finding that defendants met the subjective-knowledge test where they were aware of the plaintiff's "symptoms and behavior at the jail").  Thus, the allegations in the complaint are more than enough to state a plausible claim that Agee and Cheatham met the subjective-knowledge requirement.

The court finds that Gartman's allegations are sufficient to state a claim for deliberate indifference. The court turns next to determining whether Agee and Cheatham are nevertheless protected from suit by qualified immunity.

## B. Qualified Immunity

Officers Agee and Cheatham argue that qualified immunity bars Gartman from bringing a claim against them.[6]  "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (internal quotation marks and citation omitted).  The Eleventh Circuit follows a two-step analysis to determine whether a public official is entitled to qualified immunity. *See Sims v. Metro. Dade Cty.*, 972 F.2d 1230, 1236 (11th Cir. 1992). First, the defendant must prove that he was acting within the scope of his 'discretionary authority' at the time of the allegedly illegal conduct. *See id*.  Once this is shown, the burden shifts to the plaintiff to prove that

---

6.  Agee and Cheatham also claim that they are protected from any state claims by both absolute and state-agent immunity.  Because Gartman has not brought any state claims against either Agee or Cheatham, the court need not reach this issue.

the defendant's actions violated clearly established
statutory or constitutional law.  *See id*.  Here, both
parties agree that Agee and Cheatham were acting within
the scope of their discretionary authority during the
time period at issue.  Thus, the sole question is whether
their actions violated clearly established law.

"For a constitutional right to be clearly
established, its contours must be sufficiently clear that
a reasonable official would understand" that his conduct
violates that right, thereby giving fair and clear
warning to a government official who may engage in such
behavior.  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)
(internal quotation marks and citation omitted).  "This
is not to say that an official action is protected by
qualified immunity unless the very action in question has
previously been held unlawful ...; but it is to say that
in the light of pre-existing law the unlawfulness must be
apparent."  *Id*.

A plaintiff may show the violation of a clearly
established right in three ways.  "First, and most

31

commonly, a plaintiff can point to a case with materially similar facts decided by the Supreme Court, the Court of Appeals, or the highest court of the relevant state." *Sebastian v. Ortiz*, 918 F.3d 1301, 1310 (11th Cir. 2019) (internal quotation marks and citation omitted). A plaintiff may also show "that a broader, clearly established principle should control the novel facts in this situation. The final, and often most difficult option is to demonstrate that the official's conduct was so far beyond the hazy border between [unlawful] and acceptable [conduct] that the official had to know he was violating the Constitution even without caselaw on point." *Id.* (internal quotation marks, brackets, and citations omitted). The Eleventh Circuit has also stated in dicta that "[a] finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who *deliberately* ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law." *Hill v. DeKalb Reg'l Youth Det. Ctr.*,

40 F.3d 1176, 1186 (11th Cir. 1994), *overruled in part on
other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002).

As discussed in detail in the previous section,
Gartman alleges sufficient facts to state a claim that
Officers Agee and Cheatham were deliberately indifferent
in violation of his Fourteenth Amendment right to medical
care.  Since materially similar cases clearly established
this right prior to the time that Agee and Cheatham
acted, they are not protected from the claim by qualified
immunity.

First, the law was clearly established that Gartman's
symptoms demonstrated a substantial risk of serious
harm.[7]  Far before the events at issue here, the Eleventh

---

7. The Eleventh Circuit has reserved the question of
whether prior precedent must clearly establish that the
specific medical issue in the case constitutes a serious
medical need.  *See Patel v. Lanier Cty.*, 969 F.3d 1173,
1191 n.11 (11th Cir. 2020).  However, the court in *Patel*
found it "unlikely that an officer will be able to avail
himself of qualified immunity where ... the evidence
allows the inference that he was aware of *and flatly
ignored* a serious risk of harm requiring medical
attention just because our prior case law didn't put him
on notice of that risk."  *Id.*  The court explained that,
"[b]ecause a serious medical need is, by definition, one
that ... would be obvious to lay people, no officer can

Circuit held that an inmate presenting with shortness of breath, dizziness, and sweating can have a serious medical need--particularly when he has an underlying condition related to those symptoms. *See Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995); *Aldridge v. Montgomery*, 753 F.2d 970, 973 (11th Cir. 1985). Agee and Cheatham had plenty of notice that Gartman's symptoms were dangerous and that they were obligated to respond to them.

It was also clearly established that it is unreasonable for an official to ignore an inmate whose condition is deteriorating, even if that inmate had previously received some medical care. In *Carswell v. Bay County*, the Eleventh Circuit held that there was sufficient evidence to find that a jail administrator had been deliberately indifferent to an inmate's medical

---

be unfairly surprised to learn that he violated the Constitution by flatly ignoring it." *Id*. Since Agee and Cheatham are alleged to have flatly ignore Cheatham's condition, that reasoning would apply with equal force here. Regardless, circuit precedent had clearly established that Gartman's symptoms did constitute a

34

needs even though he had received some medical care.   854 F.2d 454, 457 (11th Cir. 1988).   The court concluded that the nonmedical official "had knowledge of Carswell's need for medical care" beyond what he had already received because he "saw Carswell's deteriorating condition during rounds at the jail" and "received a request specifically addressed to him from Carswell for medical attention." *Id*.   The fact that he nevertheless "did nothing significant" to ensure that Carswell received the medical attention he obviously needed was enough, the court found, to constitute deliberate indifference, despite the fact that Carswell had received some medical attention and the relevant official was not a medical professional. *Id*.

The Eleventh Circuit reiterated this standard in *Goebert v. Lee County*, 510 F.3d 1312 (11th Cir. 2007). There, the court held that the facility commander of a jail was not entitled to qualified immunity from an inmate's deliberate indifference claim because he had

serious medical need, so there is no basis for qualified

"abundant reason to believe that her medical need was serious," despite the fact that she was under the care of prison medical staff. *Id*. at 1327. The court specifically noted that *Carswell* had put the facility commander on notice "that his actions or inaction violated [the inmate's] constitutional right to timely treatment of her serious medical needs" because it established that when an inmate's condition has deteriorated to the point where it is obvious to a lay observer, a jail official is not excused from acting simply because a doctor had previously treated the inmate. *Id*. at 1331.

Both *Carswell* and *Goebert* underscore that "when an inmate's medical condition is so obviously dire that a nonmedical official must know that the inmate requires additional medical attention, that official can be held liable for deliberate indifference if he does nothing." *Fikes v. Abernathy*, 793 F. App'x 913, 924 (11th Cir. 2019). By the time of the incident at issue here, it was

___

immunity under any test.

thus a clearly established principle that "a nonmedical official does not fulfill his obligations to an inmate whose condition is clearly deteriorating merely by obtaining *some* medical attention for the inmate, if it is plain and obvious to a person without medical expertise that the care is inadequate and insufficient." *Id.*

It had further been established that Agee and Cheatham's failure to act for even the short period until Gartman was released was impermissible. The Eleventh Circuit has repeatedly held that delay in the "treatment of serious and painful injuries [is] clearly recognized as rising to the level of a constitutional claim." *Harris v. Coweta Cty.*, 21 F.3d 388, 393 (11th Cir. 1994). A delay of mere hours in the treatment of emergency medical needs--those with a "degree of immediacy" equal to or greater than "broken bones and bleeding cuts"--has been established to constitute deliberate indifference. *Id.* at 394; *see also Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010) (finding it established law that short delays in responding to a serious medical need may

37

"constitute a constitutional violation if injuries are sufficiently serious").   It is beyond question that symptoms of a heart attack, especially in a patient with a preexisting heart condition, present an emergency situation requiring immediate care.   Agee and Cheatham had plenty of notice that even a short delay in providing care was unacceptable under established law.

Moreover, even if there had been no materially similar cases, the circumstances here would still be governed by the "broader, clearly established principle" that an official's knowledge of an inmate's need for medical care and intentional refusal to provide that care constitutes deliberate indifference.   *Patel v. Lanier Cty.*, 969 F.3d 1173, 1190 (11th Cir. 2020).   The Eleventh Circuit has held that nothing more is required to put an officer on notice that "complete abdication in the face of a known serious need is unconstitutional."   *Id*. at 1191.   If an officer actually knows about a condition that poses a substantial risk of serious harm and yet does *nothing* to address it, as Agee and Cheatham

38

allegedly did here, "the preexisting decisional language obviously and clearly applies" and the officer is not entitled to qualified immunity. *Id*. (brackets, ellipses, and citation omitted).

Agee and Cheatham were on notice that they were obligated to obtain additional care for Gartman based on his symptoms and deteriorating condition and that failure to do so would violate his Fourteenth Amendment rights. Instead of obtaining such care, they allegedly mocked and ignored him.   They are not protected by qualified immunity from his resulting claim.

* * *

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that defendants Jabari Agee and Patrick Cheatham's motion to dismiss (doc. no. 96) is denied.

DONE, this the 11th day of January, 2021.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE