IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

TRENTON GARTMAN,                )
                                )
        Plaintiff,              )
                                )        CIVIL ACTION NO.
        v.                      )        2:18cv534-MHT
                                )            (WO)
PATRICK CHEATHAM, an            )
Individual, et al.,             )
                                )
        Defendants.             )

OPINION AND ORDER

Plaintiff Trenton Gartman brought this lawsuit based on an alleged incident in which he suffered heart problems and was shocked by his implantable cardioverter defibrillator (ICD) more than 20 times during a roughly one-day stay in custody at a county jail. Gartman brings 42 U.S.C. § 1983 claims against defendants Patrick Cheatham and Jabari Agee, who were employed as correctional officers at the jail, and defendant Lisa Brady, a registered nurse who worked at the jail as an employee of the company that contracted to provide healthcare services to inmates. All defendants are sued in their individual capacities.

Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

This case is now before the court on the defendants' motions for summary judgment.[1] For the reasons that follow, the motions will be denied.

## I.   Summary-Judgment Standard

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's role at this stage is "not to weigh the evidence or to

---

1. Although Cheatham and Agee previously moved to dismiss on the basis of qualified immunity, *see Gartman v. Cheatham*, No. 2:18cv534-MHT, 2021 WL 96467, at *8 (M.D. Ala. Jan. 11, 2021) (Thompson, J.), they do not raise this issue in their motion for summary judgment. Brady also does not assert the defense of qualified immunity in her motion for summary judgment.

2

determine the truth of the matter, but rather to determine only whether a genuine [dispute] exists for trial." *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1109 (M.D. Ala. 2016) (Thompson, J.). Accordingly, the court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.*

## II. Background

Viewing the evidence in the light most favorable to Gartman, the facts are as follows. On May 25, 2016, Gartman was arrested by the Prattville, Alabama Police Department on a misdemeanor charge for domestic abuse in the third degree. He was taken to the Autauga

County Jail, where he was booked and processed as a new inmate by Sergeant Cheatham.  According to the jail administrator, Gartman was required to be held in custody for 24 hours absent an order from a judge or magistrate.  *See* Nixon Deposition (Doc. 175-11) at 19.

According to Dr. Clifton Vance, a cardiologist who has treated Gartman for roughly a decade, Gartman has a heart condition associated with a weakened heart muscle and a prior heart attack.  *See* Vance Deposition (Doc. 175-13) at 5.  To control this condition, Gartman takes several regular medications and has an ICD, a battery-operated device that was surgically implanted in his chest.  The ICD detects "lethal heart rhythms" and responds by either pacing out of the fast rhythm or, when necessary, "shock[ing] the heart back to normal rhythm."  *Id.*

During his booking, Gartman told Cheatham that he had heart problems, including a prior heart attack, and chronic obstructive pulmonary disease, a respiratory

problem.  He also listed all of the medications he took and stated that he had an ICD.  *See* Gartman Deposition (Doc. 175-14) at 8; Cheatham Deposition (Doc. 175-10) at 19.

After he was processed, Gartman was placed in a "holding tank" with several other inmates.  Gartman Deposition (Doc. 175-14) at 18.  According to Gartman, around 10:00 or 11:00 p.m. he reported to a correctional officer that he was having chest pains and that he felt dizzy and lightheaded.  *See id.* at 19-20. He also felt a painful tingling in his arm that he had previously experienced when he had a heart attack.  *See id.* at 20.  In response to Gartman's complaint, the correctional officer informed Gartman that he called the nurse and that she would see Gartman at 5:00 a.m. when she came in.  *See id.*  After this, Gartman's symptoms gradually subsided, and he and several other inmates were moved to a separate pod.

A recording of an outgoing call placed around 12:30

a.m. on May 26 reflects that a correctional officer
left a message for Nurse Brady informing her that an
inmate later identified as Gartman was "saying he's
having pains, his heartbeat's out of rhythm, he's got a
heart problem and different things going on, [and] he's
dizzy and whatnot." Pl.'s Ex. 2. According to the
correctional officer who placed this call, Gartman
complained of these symptoms during the booking
process, although she could not recall whether Cheatham
was present to hear these complaints. *See* McAllister
Deposition (Doc. 175-8) at 6.

Brady slept through this call and responded shortly
after 4:00 a.m. The correctional officer informed her
that the inmate had "calmed down" and was "not
complaining right now." Pl.'s Ex. 5. Brady called
again about an hour later to get the inmate's name and
check whether he was alright. The correctional officer
reiterated that the inmate had calmed down. She also
explained that she had told the inmate that if he could

6

not breathe, then he would be on the floor.  Brady
responded, "Yeah, good for you."  Pl.'s Ex. 6.  Brady
mentioned that she would be arriving at the jail early
that morning and asked where the inmate was.

Brady did not see Gartman in the morning.  Shortly
after 8:30 a.m., however, she received Gartman's
medications from his family.  She made no effort to
verify the medications and provide them to Gartman or
to inquire whether he had been able to take them the
previous night as prescribed.  *See* Brady Deposition
(Doc. 175-5) at 54.  Gartman had not, in fact, been
permitted to take his medications, *see* Gartman
Deposition (Doc. 175-14) at 20, although Dr. Vance was
unable to conclude whether this caused any of Gartman's
symptoms while in custody, *see* Vance Deposition (Doc.
175-13) at 8-9.

According to Gartman, around 1:00 p.m. he again
began to feel chest pain as if someone was sitting on
his chest, as well as the tingling in his arm.  *See*

Gartman Deposition (Doc. 175-14) at 23.  He asked another inmate to call a nurse while he lay down. Officer Agee escorted Gartman to see Brady at the nurse's station around 2:00 p.m.  *See id.* at 24-25; Pls. Ex. 10 (Doc. 175-1) at 5.

At the nurse's station, with Agee present, Gartman told Brady that he was experiencing "chest pain, shortness of breath, and dizziness," and that these symptoms had worsened since lunch.  Gartman Declaration (Doc. 175-15) at 2.  He informed Brady about his heart condition and history, his ICD, and his heart medications and the fact that he had not been able to take them.  *See id.*  Brady measured Gartman's respiration rate and found it to be elevated above a normal range.  *See* Brady Deposition (Doc. 175-5) at 19. According to Brady, she attributed this elevated rate to anxiety and declined to take any additional vital signs.  *See id.* at 20.  Other witnesses, however, testified that Brady performed additional tests, which

8

she did not document.   Gartman testified that Brady
placed her hand on his wrist and looked at her watch,
in a manner that appeared consistent with measuring his
heart rate.   *See* Gartman Deposition (Doc. 175-14) at
25.   Agee went even further and testified that Brady
measured Gartman's blood pressure and temperature and
connected wired nodes to his chest as if to take an
electrocardiogram (EKG).   *See* Agee Deposition (Doc.
175-9) at 31-33; *see also* Cheatham Deposition (Doc.
175-10) at 19-20 (stating that he saw Brady pulling out
the EKG machine).

Brady then asked Gartman to provide a urine sample,
and Agee accompanied him to the restroom.   When Gartman
tried to pee, his ICD shocked him, causing him to
scream and fall to the floor.   *See* Gartman Declaration
(Doc. 175-15) at 2; Gartman Deposition (Doc. 175-14) at
25.   Agee was next to him and needed to assist him to
sit on a foot stool.   *See* Gartman Deposition (Doc.
175-14) at 27.   Gartman told Brady that something was

wrong and that his ICD had fired. *See* Gartman Declaration (Doc. 175-15) at 2-3. When Brady told him he was fine, Gartman insisted that he was not fine. *See id.* at 3. Around 3:00 p.m., Brady called to request that an officer come to the medical station because she had "Gartman on the floor." Pl.'s Ex. 8; *see also* Cheatham Deposition (Doc. 175-10) at 20. Cheatham (who arrived in response) and Agee helped Gartman to stand up and walked him out of the nurse's station. *See* Gartman Declaration (Doc. 175-15) at 3.

The officers escorted Gartman to his most recent cell to retrieve his belongings before returning him to the holding cell. On their way to the holding cell, Gartman's ICD shocked him again, causing him to fall to the floor and defecate on himself. *See* Gartman Declaration (Doc. 175-15) at 3; Gartman Deposition (Doc. 175-14) at 28. Gartman told Cheatham and Agee that his ICD had fired, that he had defecated on himself, and that he needed to go to the hospital. *See*

Gartman Declaration (Doc. 175-15) at 3. Cheatham and Agee forced him to get up and continued to escort him to the holding cell. After about ten steps, Gartman's ICD fired again, and Gartman again fell. Gartman reiterated that his ICD had fired and that he needed to go to a hospital. *See id.* at 3-4. The officers pulled Gartman up from the ground and told him to walk to the cell. *See* Gartman Deposition (Doc. 175-14) at 31. Cheatham added that he would charge Gartman with assaulting an officer if Gartman touched him, to which Gartman replied that he could not control what he did when he was shocked. *See id.*

Gartman again started to walk with the officers, slowly and with "labored breathing." Gartman Declaration (Doc. 175-15) at 4. Near the nurse's station, Gartman's ICD shocked him again, and Gartman fell down. *See* Gartman Deposition (Doc. 175-14) at 31; Agee Deposition (Doc. 175-9) at 36 (estimating that the nurse's station was "[m]aybe forty feet" away).

11

Gartman loudly insisted that he could not get up, that
his ICD had shocked him, that he was having a heart
attack, and that he needed to go to the hospital. *See*
Gartman Declaration (Doc. 175-15) at 4.  While Cheatham
and Agee again yelled at Gartman to get up, a third
officer in the area drew his taser and threatened to
tase Gartman if he did not stand up. *See id.*; Agee
Deposition (Doc. 175-9) at 38; Cheatham Deposition
(Doc. 175-10) at 21; Slater Deposition (Doc. 175-12) at
6.  According to Brady, she saw Gartman as he passed
the nurse's station, although she denies that she saw
him fall or heard the officers yelling about a taser.
*See* Brady Deposition (Doc. 175-5) at 29-30.

After numerous falls, Gartman reached the holding
cell.  As Cheatham removed Gartman's handcuffs,
Gartman's ICD shocked him again.  Cheatham again
threatened to charge Gartman with assaulting an officer
if Gartman hit him.  *See* Gartman Declaration (Doc.
175-15) at 5.  At that point, Gartman lay on his back

on the floor until he received a visit from his attorney around 4:00 p.m.  Cheatham brought Gartman to this visit by wheelchair.  While Gartman was with his attorney, Gartman's ICD shocked him again, and Cheatham returned Gartman to his cell.  *See id.*; *see also* Pls. Ex. 10 (Doc. 175-1) at 20 (indicating that this visit ended at 4:05 p.m.).  Cheatham let Gartman out of his cell once more prior to his release, again in a wheelchair, in order to take a shower.  While Gartman was in the shower, his ICD shocked him multiple times until he asked to be returned to his cell.  *See* Gartman Deposition (Doc. 175-14) at 34; Gartman Declaration (Doc. 175-15) at 5.  According to Cheatham, he twice informed Brady of Gartman's ongoing symptoms.  *See* Cheatham Deposition (Doc. 175-10) at 28-29.  Agee similarly testified that he told Brady that Gartman had fallen.  *See* Agee Deposition (Doc. 175-9) at 43.  Brady disputed that either officer told her about additional shocks or updated her on Gartman's condition.  *See*

13

Brady Declaration (172-2) at 20-21.

After Gartman's attorney told correctional staff that Gartman needed medical attention, Cheatham called Prattville Emergency Medical Services at 5:12 p.m. *See* Pls. Ex. 26 (Doc. 175-17); Cheatham Deposition (Doc. 175-10) at 16, 30; Nixon Deposition (Doc. 175-11) at 11.  Around 5:30 p.m., Gartman was released from the jail on a gurney and transported directly to the hospital by ambulance. *See id.*  In the ambulance, Gartman received an intravenous (IV) injection. *See id.*; Gartman Deposition (Doc. 175-14) at 35-36; *see also* Vance Deposition (Doc. 175-13) at 8 (noting generally that IV medications may be provided "to try to get the heart to stay in rhythm").

According to reports downloaded from Gartman's ICD, between 2:00 p.m. and 5:30 p.m. on May 26, 2016,[2] the

_____

2. Two different episode summaries downloaded from Gartman's ICD list firing times that are 12 minutes apart. *Compare* Defs.' Ex. S (Doc. 172-2) at 137-138 (indicating that Gartman's ICD fired between 2:23 p.m. and 5:12 p.m.), *with* Defs.' Ex. T (Doc. 172-2) at 145

device recorded 37 episodes of ventricular fibrillation--a condition involving potentially "lethal heart rhythms," Vance Deposition (Doc. 175-13) at 5--and delivered 27 shocks to his heart. *See* Pl.'s Ex. 11 (Doc. 175-18) at 1-3. During these episodes, Gartman's heart rate was between 222 and 272 beats per minute. *See id.* According to Dr. Vance, Gartman's heart was repeatedly going out of rhythm and being shocked back into rhythm by the ICD. *See* Vance Deposition (Doc. 175-18) at 8. In the aftermath of this incident, Gartman's ICD was replaced and several additional procedures were performed; Vance opined that these medical procedures likely would have been required "at some point" regardless of Gartman's experience in the jail. *Id.* at 9-11; *see also* Wilensky Report (Doc. 172-3) at 11.

---

(indicating that Gartman's ICD fired between 2:11 p.m. and 5:00 p.m.). The parties do not contend that this discrepancy affects their arguments at the summary-judgment stage.

15

### III. Motions for Summary Judgment

### A. Fourteenth Amendment

The Eighth Amendment prohibits "cruel and unusual punishments," U.S. Const. amend. VIII, including "deliberate indifference to serious medical needs of prisoners," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999). While claims involving the mistreatment of pretrial detainees are governed by the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment, the Eleventh Circuit Court of Appeals has treated the standards under the two amendments as "identical." *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326

16

(11th Cir. 2007).   Although the Eleventh Circuit declined to decide whether this remains true following the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389, 400-02 (2015) (holding that an objective standard applies to excessive force claims brought by pretrial detainees under the Fourteenth Amendment because "pretrial detainees (unlike convicted prisoners) cannot be punished at all"), *see Dang ex rel. Dang v. Sheriff, Seminole Cty., Fla.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (declining to reach question of whether "a pretrial detainee alleging constitutionally deficient medical care need not show deliberate indifference"), the appellate court has continued to require proof of deliberate indifference with respect to pretrial detainees' claims of inadequate medical care.   *See, e.g.*, *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020); *Bryant v. Buck*, 793 F. App'x 979, 983 n.3 (11th Cir. 2019) (per curiam).  This court will do the same.

17

Accordingly, to prevail on his § 1983 claims for deliberate indifference to his medical needs, Gartman must show "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and [his] injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).

Whether a medical need is serious is an objective inquiry. A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). Alternatively, a serious medical need may be determined by "whether a delay in treating the need worsens the condition." *Mann*, 588 F.3d at 1307. Under either definition, "the medical need must be one that, if left unattended, poses a

18

substantial risk of serious harm." *Id.* (quoting *Farrow*, 320 F.3d at 1243).

Deliberate indifference is a subjective requirement. Deliberate indifference requires proof of a defendant's "(1) subjective knowledge of a risk of serious harm; and (2) disregard of that risk (3) by conduct that is more than mere [or gross] negligence." *Dang*, 871 F.3d at 1280.[3] "Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact 'subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Goebert*, 510 F.3d at 1327 (quoting *Farmer v. Brennan*,

---

3. The Eleventh Circuit has alternately characterized the third prong as requiring conduct exceeding "gross" negligence or conduct exceeding "mere" negligence. *See Smith v. Wood*, No. 20-12918, 2021 WL 4452526, at *3 & n.2 (11th Cir. 2021) (per curiam) (collecting cases). The court's analysis holds under either framing of the standard.

511 U.S. 825, 842 (1994)).  "Disregard of the risk is also a question of fact that can be shown by standard methods."  *Id.*

### B. Serious Medical Need

The court previously found that Gartman pleaded a serious medical need.  *See Gartman*, 2021 WL 96467, at *4-5.  The court now finds that the evidence, at a minimum, creates a genuine dispute as to whether Gartman suffered a serious medical need.  The defendants do not meaningfully argue otherwise.

The records from Gartman's ICD reflect that Gartman repeatedly experienced a heart rate in excess of 220 beats per minute.  Dr. Vance identified these rates as "potentially lethal heart rhythms."  Vance Deposition (Doc. 175-13) at 6.  He elaborated that the number of defibrillator shocks that Gartman experienced was "consistent with" a ventricular tachycardia storm, which is associated with a risk of death, stroke, or

20

brain damage. *Id.* at 10.  Dr. Vance opined that this number of defibrillator shocks indicated a medical emergency, for which a patient needs to go to the emergency room. *See id.* at 7-8.

During the period in which his heart was going out of rhythm and the ICD was shocking it back into rhythm, Gartman stated that he experienced chest pain, shortness of breath, and dizziness and that these symptoms worsened over time.  By his account, he was pale, weak, and profusely sweating.  The pain of the shocks caused him to flail his extremities and fall to the floor multiple times.  On one occasion, it caused him to lose control of his bowels and defecate on himself.

A rational jury could find from this evidence that Gartman's condition in the Autauga County Jail was both painful and dangerous.  Likewise, a jury reasonably could find that Gartman's visible symptoms, combined with the chest pain, dizziness, and shortness of breath

21

that he repeatedly reported, would cause even a lay person to recognize as obvious Gartman's need for immediate medical attention.   Indeed, the urgency and seriousness of Gartman's symptoms were made all the more obvious by the fact that Gartman told Cheatham and Brady, and a jury could permissibly infer that Agee overheard, *see infra* Section IV.C.2, that Gartman had a history of serious heart issues, including a previous heart attack, that he took heart medications to control these issues, and that he had an ICD in his chest.   A reasonable lay person would understand that Gartman's symptoms required immediate medical attention in any event but would be especially sensitive to this need in light of Gartman's underlying condition, which made him particularly vulnerable. *See, e.g.*, *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995) (holding that sweating, wheezing, and shortness of breath constituted a serious medical need in a patient with diagnosed asthma); *Aldridge v. Montgomery*, 753 F.2d 970, 973-74

(11th Cir. 1985) (per curiam) (holding that a patient's complaints of headaches and dizziness, coupled with a history of traumatic head injuries, could constitute a serious medical need); *Gordon v. Frank*, 454 F.3d 858, 863 (8th Cir. 2006) ("[A] reasonable officer would consider chest pain and difficulty breathing to be symptoms that require medical attention in anyone who claims to have heart disease."); *Wright v. Hernandez*, No. 2:10-cv-336-FtM-29DNF, 2013 WL 4928439, at *5 (M.D. Fla. Sept. 12, 2013) (Steele, J.) (finding that a reasonable trier of fact could find that "numerous complaints of dizziness, shortness of breath, chest pains, and falling," together with "plaintiff's known cardiac condition," constituted a serious medical need).

## C. Deliberate Indifference

Defendants Cheatham, Agee, and Brady each argue that the evidence fails to create any genuine dispute

23

as to whether their conduct constituted deliberate indifference.  As they note, Gartman's declaration contains several speculative statements regarding the mental states of Cheatham, Agee, and Brady at various times during his detention.  The court does not rely on these statements in its analysis.  However, the record contains sufficient evidence in the form of nonconclusory statements by Gartman, the defendants, and other witnesses, as well as the reasonable inferences that could be drawn from that evidence, to create a genuine dispute as to whether each defendant exhibited deliberate indifference to a serious medical need.

### 1. Defendant Brady

The evidence presents a genuine dispute as to whether Brady was deliberately indifferent to Gartman's serious cardiac issues.

A reasonable jury could find that Brady had

subjective knowledge of a risk of serious harm to Gartman.  According to Gartman, he told Brady of the painful symptoms he was experiencing, including worsening chest pain, dizziness, and shortness of breath, together with the cardiac history that contextualized the seriousness of those symptoms.  *See* Gartman Declaration (Doc. 175-15) at 2.  Then, although Brady did not see Gartman fall when his ICD fired, she heard him yell and turned around to find him on the floor.  *See* Brady Deposition (Doc. 175-5) at 32. According to Gartman, he explained to Brady that his ICD had just fired because his heart rate exceeded 220 beats per minute and that he needed to go to the hospital.  *See* Gartman Declaration (Doc. 175-15) at 2-3.  A jury reasonably could find from this evidence that Brady was on notice of the seriousness and dangerousness of Gartman's medical condition at the time that he was in the nurse's station.

Brady argues otherwise, relying principally on the

25

deposition testimony of Gartman's cardiologist that "if the patient has one shock and they're feeling totally fine, they have no symptoms at all," then the patient likely does not need to go to the hospital emergency room. Vance Deposition (Doc. 175-13) at 7; *see also id.* at 13 ("If the patient is stable, they're not having chest pain ... or they don't feel their heart racing over and over, then we would have them come to the clinic the next day. ... One shock symptom free, yeah, very reasonable to wait to the next day."); Wilensky Report (Doc. 172-3) at 12 (stating defense expert's agreement "that one firing does not necessarily result in a referral to the ED"). She contends that, because Gartman experienced only one ICD firing when he visited the nurse's station, she lacked subjective knowledge that Gartman's medical condition was serious enough to warrant immediate, emergency-level medical care.

Even setting aside evidence that Brady became aware

26

of additional firings after Gartman had left the
nurse's station, *see* Cheatham Deposition (Doc. 175-10)
at 28-29 (testifying that Cheatham informed Brady that
Gartman continued to state that he was being shocked),
Brady's argument simultaneously overstates Dr. Vance's
testimony and understates the symptoms that Gartman
claims to have reported to her.  By its terms, Dr.
Vance's testimony as to when one ICD shock would not
warrant emergency-level care applies to patients
presenting as "symptom free."  Brady attempts to extend
this testimony to include patients whose only symptom
is chest pain, based on Dr. Vance's testimony that his
office receives "phone calls all the time about chest
pain at night, so it's not always something that has to
go to the emergency room."  Vance Deposition (Doc.
175-13) at 13.  However, this testimony does not
unambiguously address a patient who reports chest pain
*and* whose ICD has fired, particularly in light of
Vance's earlier testimony specifically identifying

27

chest pain as one symptom that would undermine a determination that a patient whose ICD had fired once was "stable" enough not to go to the emergency room. *Id.*

Moreover, chest pain was not the only symptom that Gartman reported. According to Gartman, he told Brady not only that his ICD had fired and that he was experiencing chest pain, but also that he was experiencing dizziness and shortness of breath and that his symptoms were worsening. Outwardly, he was pale and sweaty and had difficulty getting up from the ground. While Brady testified that Gartman said nothing about why he was coming to see her and that she perceived him as "stable," Brady Deposition (Doc. 175-5) at 57, 59, the conflicting evidence creates a genuine dispute that is appropriately resolved by a jury weighing credibility, rather than a court acting on a motion for summary judgment.

The evidence also creates a genuine dispute as to

28

whether Brady disregarded this substantial risk of serious harm to Gartman. "[W]hen the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference." *Adams*, 61 F.3d at 1544. Brady concededly made no effort to provide or obtain medical care for Gartman. She did not call for paramedics or send Gartman to the hospital, nor did she initiate a process to take either step. She did not contact the on-call doctor. And she testified that she did not even take Gartman's vitals to investigate his condition further, except to the extent that she assessed and recorded Gartman's respiration rate, which was elevated above normal levels. A jury reasonably could find that Brady's failure to take any of these actions disregarded a known risk of serious harm to Gartman and amounted to more than negligence.

## 2. Defendants Cheatham and Agee

Although similar evidence bears on the questions of whether Cheatham or Agee exhibited deliberate indifference, the court emphasizes that "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). Even considering the different information available to Cheatham and Agee, the evidence presents a genuine dispute as to whether each officer was deliberately indifferent to Gartman's heart issues after he left the nurse's station.

A reasonable jury could find that Cheatham and Agee were each individually aware of Gartman's underlying heart condition, his history of heart issues, and the ICD implanted in his chest. Gartman shared this information directly with Cheatham during the booking process. And a reasonable jury permissibly could infer that Agee overheard this information as he stood in the

nurse's station while Gartman explained his history of
heart issues and his present symptoms to Brady.
Although Agee testified that he "tr[ies] not to
overhear" anything that is said between inmates and
nurses, Agee Deposition (Doc. 175-9) at 32, a jury need
not credit this testimony, particularly in light of
Agee's testimony that he did, in fact, observe and
overhear some interactions between Gartman and Brady
during the visit, *see id.* at 31-34.

In light of this context, the evidence presents a
genuine factual issue as to whether Cheatham and Agee
each had subjective knowledge of a substantial risk of
serious harm to Gartman. Gartman's condition
unmistakably deteriorated as Gartman's ICD repeatedly
shocked him in the presence of both officers. Agee was
standing next to Gartman the first time that Gartman's
ICD shocked him. Both Cheatham and Agee were present
with Gartman as they escorted him out of the nurse's
station and as Gartman's ICD proceeded to shock him at

least three additional times.  And Cheatham was present
when Gartman's ICD shocked him again when he arrived at
the holding cell.

Each shock caused Gartman to scream, flail, and
fall to the ground.  Gartman grew weak, pale, and
sweaty, clutched his chest, and, on one occasion,
defecated on himself.  After each shock, Gartman
explained that his ICD had shocked him and that he
needed to go to the hospital.  If Gartman's account is
credited, a lay person in Cheatham or Agee's shoes
would recognize an obvious need for immediate medical
attention.

Rather than providing or requesting immediate
medical attention for Gartman, a reasonable jury could
find that Cheatham and Agee flatly ignored Gartman's
pleas for help.  According to Gartman, each time he
fell to the floor in response to a shock from his ICD
while walking back to the holding cell, the officers
forced him to stand up and continue walking over his

32

protestations that his ICD was firing and that he needed hospital-level care.   Twice, Cheatham threatened to charge Gartman with assault for flailing as he fell. Although both officers claimed that they kept Brady apprised of Gartman's condition, *see* Cheatham Deposition (Doc. 175-10) at 28-29; Agee Deposition (Doc. 175-9) at 43, a reasonable jury could discredit this testimony in light of Brady's conflicting account, *see* Brady Declaration (Doc. 172-2) at 20-21.   To the extent Cheatham and Agee argue that there is no inconsistency between their testimony that they informed Brady of Gartman's involuntary defecation, falling over, and additional shocks and Brady's statement that she was not "made aware that Mr. Gartman's condition had deteriorated," Cheatham and Agee fail to view Brady's statement in the light most favorable to Gartman as required by the summary-judgment standard.   A reasonable jury could find that, for over an hour between when Cheatham and

Agee began to escort Gartman from the nurse's station and when paramedics were finally requested, Cheatham and Agee made no attempt to obtain medical treatment or attention for Gartman, in the face of visible symptoms and behaviors coupled with Gartman's reports of pain. Given the obvious seriousness of Gartman's symptoms, the evidence creates a genuine dispute as to whether this decision by both officers not to take any actions to secure medical treatment--either by Brady and jail medical staff or by paramedics--disregarded a known risk of serious harm and amounted to more than negligence. *See Carswell v. Bay Cty.*, 854 F.2d 454, 457 (11th Cir. 1988) (holding that a jail administrator who observed an inmate's "deteriorating condition" and received a request for medical attention from the inmate could be found deliberately indifferent for doing nothing to ensure that the inmate received medical attention).

Cheatham and Agee argue, as they did in their

earlier motion to dismiss, that their inaction does not constitute deliberate indifference because they merely relied on Brady's medical judgment.  As the court previously noted, however, "it 'misstates the controlling law' to say that the 'provision of medical care ... precludes an Eighth Amendment claim.'" *Gartman*, 2021 WL 96467, at *6 (quoting *McElligott*, 182 F.3d at 1259).  "If an officer realizes that an inmate is still in need of care, even if he had previously been seen by a medical professional, he has a duty to, at the very least, 'look into the matter.'"  *Id.* (quoting *Goebert*, 510 F.3d at 1328).  Thus, Gartman's visit with Brady did not relieve Cheatham and Agee of all obligations to monitor Gartman's condition and take action; to the contrary, Cheatham and Agee both testified that Brady, or another medical staff, specifically told them to place Gartman on "observation," Agee Deposition (Doc. 175-9) at 30; Cheatham Deposition (Doc. 175-10) at 21-22, which Agee

understood at least to mean that he was responsible to check that Gartman was "still breathing," Agee Deposition (Doc. 175-9) at 30. A reasonable jury could find that Cheatham and Agee, on notice that Gartman's medical condition warranted monitoring, instead chose to ignore and disregard obvious symptoms that Gartman's condition was serious and worsening. *See, e.g.*, *Fikes v. Abernathy*, 793 F. App'x 913, 921 (11th Cir. 2019) (per curiam) (holding that, even after medical visits, correctional staff "were required ... to notice that [an inmate's] condition was very serious and getting worse and intervene to get him the medical attention he obviously needed").

### D. Causation

Brady, Agee, and Cheatham argue that there was no causal connection between any deliberate indifference attributable to them and any injuries suffered by Gartman. The court need not reach any questions as to

long-term consequences for Gartman because the evidence
creates a genuine dispute as to whether deliberate
indifference by Cheatham, Agee, and Brady caused
Gartman to experience needless pain while he waited
over an hour to receive medical treatment for his heart
condition.

An inmate's experience of unnecessary pain may
constitute a cognizable injury for a claim of
deliberate indifference. *See McElligott*, 182 F.3d at
1257 (recognizing that "prison officials may violate
the Eighth Amendment's commands by failing to treat an
inmate's pain"). "Deliberately inflicted pain, as with
an electric cattle prod, does not become unimportant
and unactionable under the [E]ighth [A]mendment simply
because the pain produced is only momentary." *Brown v.
Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (per
curiam). The Eleventh Circuit has recognized that
hourlong delays before inmates were provided medical
treatment may constitute an injury that supports a

37

constitutional claim. *See, e.g.*, *id.* (holding that "a deliberate delay on the order of hours in providing care for a ... broken foot is sufficient to state a constitutional claim"); *Aldridge*, 753 F.2d at 972-73 (holding that ignoring a bleeding cut for two and a half hours before it was sutured was actionable).

To the extent that Cheatham and Agee argue that they were prohibited by jail policy from calling paramedics, a reasonable jury could find that both officers made no attempt to notify either jail medical staff or superior officers of Gartman's serious medical need, delaying Gartman's receipt of treatment for his heart issues. And insofar as Brady argues that no delay in treatment was attributable to her inaction because any processes that she could have followed to obtain emergency medical care for Gartman would have taken more time than it actually took for Gartman to be released, the evidence does not justify summary judgment on this basis. The evidence does not clearly

reflect when the process to approve Gartman for release started.   Although Cheatham testified that the jail administrator began speaking with Gartman's attorney about the release process as early as 4:05 p.m., *see* Cheatham Deposition (Doc. 175-10) at 27, the jail administrator denied that he spoke with Gartman's attorney and testified that another correctional officer under Cheatham had contacted the city for approval of Gartman's release, *see* Nixon Deposition (Doc. 175-11) at 11, 13-14; *see also* Pls. Ex. 9 (4:57 p.m. call inquiring whether Gartman could "go a few minutes early").   Even if the court were to assume that the release process actually began immediately at 4:05 p.m. and would not have proceeded any faster if Brady had made any effort to obtain an order to send Gartman to the hospital, a reasonable jury still could find that Brady's deliberate indifference caused a roughly one-hour delay in treatment of Gartman's medical condition from the time that Brady called for another

correctional officer after Gartman's ICD shocked him in the nurse's station.

## IV. Conclusion

Based on the evidence presented at this stage, a reasonable jury could find that Brady, Cheatham, and Agee, or some combination of the three, chose to wait out Gartman's time in the custody of the Autauga County Jail and that, for over an hour, they did so with deliberate indifference to the serious, painful, and dangerous cardiac condition that Gartman was experiencing and had directly reported to each of them. The evidence creates genuine disputes of material fact as to whether each defendant violated Gartman's Fourteenth Amendment rights.

***

Accordingly, it is ORDERED that:

(1) Defendants Patrick Cheatham and Jabari Agee's motion for summary judgment (Doc. 163) and defendant

Lisa Brady's motion for summary judgment (Doc. 168) are denied.

(2) This case will proceed to trial on the claims discussed in this opinion and order.

DONE, this the 9th day of March, 2022.

_____/s/ Myron H. Thompson_____
UNITED STATES DISTRICT JUDGE