IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| TRENTON GARTMAN, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) CASE NO. 2:18-CV-534-MHT-JTA |
| | ) |
| PATRICK CHEATHAM, et al., | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S TRIAL BRIEF**

       s/ Henry F. (Hank) Sherrod III
Henry F. (Hank) Sherrod III
HENRY F. SHERROD III, P.C.
119 South Court Street
Florence, Alabama 35630
(256) 764-4141

*Attorney for Plaintiff*

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE MEDICAL RECORDS LACK INTEGRITY . . . . . . . . . . . . . . . . . . . . . . 6

DAMAGES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

DELIBERATE INDIFFERENCE STANDARD . . . . . . . . . . . . . . . . . . . . . . . . 7

EVIDENTIARY ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.     Adverse Parties and Individuals Identified with a Party Are Subject to Cross-Examination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.    The ICD Data and the Jail Audio Recordings Are Relevant and Admissible Hearsay as Business Records. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| TRENTON GARTMAN, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | CASE NO. 2:18-CV-534-MHT-JTA |
| ) | |
| PATRICK CHEATHAM, et al., ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFF'S TRIAL BRIEF

Plaintiff submits the following trial brief:

## INTRODUCTION

Gartman was having a heart attack right in front of everyone, including nurse Brady and corrections officers Agee and Cheatham, but no one was willing to do what obviously needed to be done (send Gartman to the hospital) because Gartman was a city inmate who was not their problem. No defendant contends medical and jail personnel act consistent with the Constitution by ignoring a man with chest pain, shortness of breath, and other obvious heart-related symptoms whose ICD is repeatedly firing in his chest. The question for the jury is whether defendants subjectively perceived the reality of what was right before them.

## FACTUAL BACKGROUND

Gartman was a Prattville city inmate in the Autauga County Jail on a 24 hour

hold. The practice was that QCHC would leave any decision regarding outside medical care up to the city magistrate. Gartman was booked into the jail by defendant Cheatham between 9:30 and 10:00 p.m. on May 25, 2016. Because of the nature of the arrest, Gartman was under a 24-hour hold, which meant he was not due to be released until 5:50 p.m. on May 26. During booking, Gartman provided Cheatham with details regarding Gartman's cardiac history, including his many medications and his pacemaker/ICD.[1]

Just after midnight, after Cheatham had left for the day, while Gartman was still being held in booking, Gartman started experiencing heart-related symptoms, including chest pain, and reported them to the jail staff, who left a voicemail for nurse Brady. Brady listened to her voicemail and spoke with jail staff regarding Gartman's heart episode between 4:00 and 5:00 a.m. Brady asked if Gartman was okay and was told that Gartman was calm now.

Brady came in around 6:30 a.m. but did not check on Gartman.

At approximately 8:30 a.m., Brady spoke with Gartman's parents and refused to take Gartman's medications.

The basic chronology of the events at issue is documented in jail audio recordings, jail log entries, medical records, and the device in Gartman's chest. It is

---

[1] ICD is the abbreviation for an implantable cardioverter defibrillator.

2

largely undisputed.

Beginning after lunch, Gartman's heart-related symptoms, including chest pain, returned, and Gartman got another inmate to call for assistance. Gartman was taken to the nurse's station and seen by nurse Brady.

While nurse Brady denies knowledge of any heart symptoms, Gartman says he not only told nurse Brady about his heart-related medical history, his ICD, his need to take his heart medications, and that he had not taken his heart medications, but also about his current, serious heart-related symptoms, including chest pain, shortness of breath, and dizziness, and how they had been getting worse since after lunch.

Brady then sent Gartman to the bathroom to provide a urine sample. In the bathroom, Gartman was shocked by his ICD, screamed, and fell to wall and then to the floor. Gartman had difficulty getting up and had to be assisted back to the exam room, where he sat, not on the exam table, but on the inches-high footrest. Gartman's chest was pounding, and his breathing was labored.

Gartman told Brady his ICD had fired because Gartman's heart rate exceeded 220 beats per minute and that he needed to go to the hospital.

Brady held Gartman's wrist as if she was checking Gartman's heart rate and told Gartman he was fine. Gartman told her, among other things, that he was not fine. Gartman could tell that his heart was racing, and a jury can conclude that Brady knew,

3

just as Gartman did, that his heart was racing.

Brady says she did not get any of Gartman's vital signs after Gartman's ICD fired. Brady admits she did not use the ECG machine in her office or call the doctor. She just sent him up front for the jail staff and the city to deal with.

Agee and Cheatham assisted Gartman in getting up, and Gartman walked slowly and with difficulty out of the nurse's office.

After leaving the nurse's station, Agee and Cheatham took Gartman back to his cell to retrieve his belongings. On the way back toward the front, where Gartman was to be placed in a booking cell until the 24-hour hold expired, Gartman's ICD fired, and he fell to the floor and defecated on himself. Gartman told the officers he needed to go to the hospital, but Agee and Cheatham forced Gartman to get up. Gartman got up and walked, but, after a short distance, the ICD fired again, and Gartman went to the floor. Gartman again stated that he needed to go to the hospital, but Agee and Cheatham forced Gartman to get up.

Gartman again started walking toward booking. Gartman walked slowly, with difficulty, and with labored breathing.

As Gartman approached the nurse's station, his ICD fired again, and Gartman went to the floor. As before, Gartman told Agee and Cheatham what happened (that he was shocked). Gartman said that he could not get up. This time Gartman was

4

insistent and loud, such that nurse Brady, who admits she was watching from the open door at the nurse's station, was able to hear what Gartman was yelling. Gartman yelled about his ICD firing (getting shocked), that he was having a heart attack, that every time he moved he was getting shocked, that he needed to go to the hospital, and that he could not get up. Gartman begged to go to the hospital. Lt. Slater came out of his office, drew his taser, and told Gartman that if he did not get up, he would Tase Gartman. Gartman eventually got up with assistance from the officers and started slowly walking with them toward the front.

At the holding cell, while the cuffs were being removed, Gartman's ICD fired again. Cheatham threatened to charge Gartman with assaulting an officer because of Gartman's involuntary movements due to the ICD firing. Once in the cell, Gartman lay as still and as calm as he could to prevent the ICD from firing any more, but Gartman was shocked multiple times before it finally stopped.

A little while later, Cheatham took Gartman by wheelchair to his attorney because Gartman could not walk on his own without his ICD firing. While Gartman was seeing his attorney, he was shocked again, the visit was cut short, and Cheatham took Gartman by wheelchair back to his cell.

After the visit, Gartman's attorney threatened to go to the sheriff, eventually prompting jail staff to contact the city to get Gartman released. Gartman lay in his cell

5

for about an hour before being told he was going to get out. Gartman asked to take a shower so he would be clean when he went to the hospital. Gartman had told jailers that the only way he was leaving the jail was by ambulance. Cheatham took Gartman to the shower in a wheelchair. Inside the shower, Gartman was shocked multiple times. Gartman eventually finished and got mostly dressed (due to getting shocked he just pulled the jail suit over his waist), and Cheatham took Gartman back to his cell. Paramedics arrived shortly thereafter, and took Gartman out on a gurney. Corrections officers forced Gartman to sign release paperwork before he could go.

## THE MEDICAL RECORDS LACK INTEGRITY

When plaintiff requested his records, including his medical records, in May 2018, shortly before his statute of limitations was going to run, the only medical record he received was a handwritten note by nurse Brady on a treatment refusal form. The jail warden, who will be a witness at trial, testified he requested all of the medical records from nurse Brady. This note is all he received. When the undersigned requested to view the original medical records during this litigation, a medical file was produced that did not contain the handwritten note or reference the event that is the subject of the note and this litigation. There is a reference to the nurse notes, but the file does not contain any nurse notes.

## DAMAGES

Plaintiff is seeking all damages **related** to the 2+ hours plaintiff suffered in the Autauga County Jail after the first firing of his ICD. Events after plaintiff left the jail are relevant and admissible for several reasons. First, that Gartman required heart procedures after leaving shows he had a serious medical need; it shows how serious the situation was for Gartman. Without testimony regarding the serious nature of Gartman's need, a jury could get the false impression that this was something less serious such as a mere mechanical failure. Second, the emotionally-traumatic nature of this incident for Gartman comes in part from the knowledge that he could have died. What medical personnel said to him (i.e., that he had or was having a heart attack and how many times plaintiff's ICD fired in the jail) is offered for its emotional impact on Gartman and not for the truth of what was stated. Gartman's emotional distress regarding what happened to him in the jail did not end once he left the jail. Third, according to Dr. Vance, while the heart procedures most likely would have been necessary in the future, the repeated ICD firings likely accelerated Gartman's need for the procedures and the replacement of the ICD battery.

## DELIBERATE INDIFFERENCE STANDARD

Under the Eighth Amendment's prohibition of "cruel and unusual punishments," jail personnel cannot act with deliberate indifference to the medical

needs of inmates. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Eleventh Circuit has applied an "identical" deliberate-indifference standard for the treatment of pretrial detainees such as Gartman under the Fourteenth Amendment. *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007). The Supreme Court has held that an objective standard governs excessive force claims asserted by pretrial detainees. *Kingsley v. Hendrickson*, 135 S.Ct. 2446 (2015). It is plaintiff's position that *Kingsley* fatally undermines the reasoning and holdings of prior case law applying the Eighth Amendment and its subjective deliberate indifference standard to pretrial detainees. The Eleventh Circuit, however, has held *Kingsley* does not affect medical care cases. *See Dang by and through Dang v. Sheriff, Seminole County Florida*, 856 F.3d 842, 850 n.1 (11th Cir. 2017). Plaintiff reserves the right to seek a change in the law on appeal.

    To establish deliberate indifference, a plaintiff must show (1) "that [he] had a serious medical need"; (2) "that the [jail] official acted with deliberate indifference to [his] serious medical need"; and (3) that there is causation. *Id.* The first prong is objective, in the sense that it looks to the inmate's actual medical condition; the second is subjective, in the sense that it looks to the official's state of mind.

    "A medical need that is serious enough to satisfy the objective component is one that has been diagnosed by a physician as mandating treatment or one that is so

8

obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotations omitted). "In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009). In "delay in treatment" cases, even when treatment is ultimately provided, deliberate indifference may be "inferred from an unexplained delay in treating a known or obvious serious medical condition." *Harris v. Coweta Cnty.*, 21 F.3d 388, 394 (11th Cir. 1994).

Under the subjective prong, deliberate indifference requires "'(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.'" *Goebert*, 510 F.3d at 1327 (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)) (alteration in original). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and **a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was 'obvious.'**" *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). (citation omitted) (emphasis added).

Conduct that is more than mere negligence includes: (1) knowledge of a serious medical need and a failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but

9

less efficacious course of treatment; or (5) medical care that is so cursory as to amount to no treatment at all. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).

A party who willfully blinds itself to the facts can be charged with constructive knowledge of them. *See Goebert*, 510 F.3d at 1328 ("Captain Weaver had a duty to look into the matter. As we have said in other contexts, '[a] party that willfully blinds itself to a fact . . . can be charged with constructive knowledge of that fact.' *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 902 (11th Cir.2003). Choosing to deliberately disregard, without any investigation or inquiry, everything any inmate says amounts to willful blindness.").

Under these facts, the involvement of a nurse provides no liability shield for Agee and Cheatham. *See Townsend v. Jefferson County*, 601 F.3d 1152, 1159 (11th Cir. 2010) (even if nurse determines inmate does not need emergency medical treatment, deputies can be liable 1) if "situation is so obviously dire" that layman would know "a medical professional had grossly misjudged [inmate's] condition" or 2) if deputies "must have known [the nurse] had ignored what she knew to be [the inmate's] serious medical need . . ..")(citation omitted).

Officials who intentionally deny or delay medical treatment for a non-medical reason are deliberately indifferent to an inmate's serious medical needs. *See Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988); *Ancata v. Prison Health*

*Services, Inc.*, 769 F.2d 700, 704 (11th Cir. 1985).

## EVIDENTIARY ISSUES

**I.  Adverse Parties and Individuals Identified with a Party Are Subject to Cross-Examination.**

FRE 611 provides that "[o]rdinarily, the court should allow leading questions: (1) on cross-examination; and (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." In this case, plaintiff would expect to call each of the defendants. As adverse parties, plaintiff should be permitted to ask leading questions of them. Additionally, other witnesses, including the corrections officers' former supervisors (William Slater and Larry Nixon), QCHC CEO Johnny Bates, and QCHC Chief Medical Officer Donald Kern, should be subject to cross-examination because each can fairly be considered to identify with a defendant. *See Haney v. Mizell Memorial Hospital*, 744 F.2d 1467, 1478 (11th Cir.1984) (stating that an agent, friend, relative, or an employee certainly qualifies as "identified with the adverse party"). If a witness is an adverse party or identified with a party, under Fed. R. Evid. 611, the witness is automatically subject to leading questions without any showing of hostility. *Id.*

## II. The ICD Data and the Jail Audio Recordings Are Relevant and Admissible Hearsay as Business Records.

Plaintiff believes he has resolved any issue related to the applicability of the business records exception to the ICD data. The parties have conferred regarding the jail recordings, but defendants have not stated their final position. Because all parties on the recordings were acting routinely, with a duty of accuracy, the recordings are admissible business records. *See ADT LLC v. Alarm Protection LLC*, No. 9:15-CV-80073-ROSENBERG/HOPKINS, 22017 WL 1881957 (S.D. Fla. May 9, 2017). Certain statements on the recordings would also be admissible under other exceptions to the hearsay rule.

Respectfully submitted,

s/ Henry F. (Hank) Sherrod III
Henry F. (Hank) Sherrod III
No. ASB-1200-D63H
HENRY F. SHERROD III, P.C.
119 South Court Street
Florence, Alabama 35630
Phone: 256-764-4141
Fax: 877-684-0802
Email: hank@alcivilrights.com

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

s/ Henry F. (Hank) Sherrod III